_____

No. 96-1911
_____

William A. Pemberton,                    *
                                         *
              Petitioner,                *
                                         * Appeal from the Railroad
     v.                                  * Retirement Board
                                         *
Railroad Retirement Board,               *
                                         *
                                         *
              Respondent.                *


_____

          Submitted:  November 21, 1996

            Filed:  March 7, 1997
_____

Before RICHARD S. ARNOLD, Chief Judge, MAGILL, Circuit Judge and SACHS,*
     District Judge.

_____

SACHS, District Judge.


     William Pemberton appeals the decision of the Railroad Retirement
Board denying his application for a disability annuity under the Railroad
Retirement Act.  Because substantial evidence on the record as a whole
supports the Board's decision, we affirm.


_____

     *The Honorable Howard F. Sachs, United States District
     Judge for the Western District of Missouri, sitting by
     designation.

## I. Background

Pemberton, who was born in 1947, worked for The Chicago and Northwestern Railroad as a brakeman/conductor and switchman from March 1971 until he suffered an on-the-job injury to his back in August 1981. A lumbar laminectomy and discectomy was performed in February 1982. Recovery was complicated by a disc space staph infection at the surgical site which required re-hospitalization in 1982 for intravenous antibiotics treatment. Pemberton never returned to work for the railroad,[1] nor has he sought other employment except for a brief period of part-time work at a baby furniture factory in the mid-1980s.

Pemberton applied for an annuity on August 3, 1993, alleging a disability onset date of August 1981 as a result of work-related injuries in 1979 and 1981 and consequent surgery.[2] The claim was denied initially and on reconsideration. Upon appeal to the Board's Bureau of Hearings and Appeals, a hearing was held in August 1995.

The medical evidence presented includes reports from both treating and consultative physicians. Orthopaedic surgeon John Pazell began treating Pemberton in January 1983 for recurring post-operative low back pain. Treatment consisted of prescribed anti-inflammatory and pain medication and physical therapy. By April of 1983, physical therapy was discontinued. Pemberton has consistently complained of constant low back pain exacerbated by weather changes or increased activity, differentiating the levels of pain in terms of "good" and "bad" days. On bad days he purportedly has

---

[1]Pemberton settled a lawsuit brought against the railroad arising from the 1981 injury in July 1987 and resigned from the railroad as required by the settlement agreement.

[2]Pemberton had previously filed an application for an annuity in February 1988, alleging disability based on the 1981 back injury and post-operative complications. He did not appeal the denial of his claim.

excruciating, totally disabling pain. About half his days are said to be bad days. Dr. Pazell has continually opined that Pemberton suffers from a post-laminectomy smoldering disc space staph infection. Periodic evaluations through mid-1989 showed Pemberton's condition unchanged; thereafter, Dr. Pazell conducted annual evaluations for three years. In July 1993, Dr. Pazell concluded that Pemberton was permanently disabled from all possible jobs, noting his condition had been stable for a number of years. Pemberton's visits to Dr. Pazell increased after his annuity application. In December 1994, Dr. Pazell reported that Pemberton suffers from limited range of motion, muscle spasm, adhesive arachnoiditis coupled with spinal stenosis and a smoldering disc space infection.[3] He further reported a worsening of Pemberton's condition as exhibited by an inability to tolerate any type of prolonged activity.

The record from the hearing also contains medical records of Dr. Richard Curnow, the surgeon who performed the 1982 back surgery and treated the disc space infection. Dr. Curnow's medical findings upon re-evaluation in January 1985 were consistent with a diagnosis of chronic low back pain. Dr. Curnow recommended no further operative treatment.

Dr. Harry Overesch, a consultative orthopaedic surgeon, examined Pemberton in 1985 and 1988. In 1985, Dr. Overesch indicated Pemberton had reached maximum recovery with limited range of motion of the back and no signs of disc space infection. In 1988, Dr. Overesch found Pemberton's condition somewhat better. Dr. Overesch concluded that although Pemberton would be unable to

---

[3]Adhesive arachnoiditis is the thickening of the fibrous membrane within the vertebral canal. Spinal stenosis involves the narrowing of the vertebral canal, nerve root canals, or interverte-bral passages caused by encroachment of bone upon space. Dorland's Illustrated Medical Dictionary 111, 1576 (28th ed. 1994).

-3-

do heavy work, he was employable in jobs not requiring repeated bending, stooping or heavy lifting.

In October 1993, Pemberton underwent a consultative examination by Dr. Thomas-Richards. X-rays indicated degenerative lumbar disc disease with almost complete obliteration of the disc space, secondary to osteomyelitic involvement.[4] Dr. Thomas-Richards found Pemberton to have restricted range of motion with chronic low back pain aggravated by exertion. He concluded Pemberton should be restricted from activities requiring prolonged walking and standing; lifting and carrying heavy weights; frequent to continuous bending, stooping, squatting, kneeling or crawling; and frequent to continuous twisting motions of the spine.

Pemberton, his fiancee Donna Buerge, and a vocational expert testified at the August 1995 hearing. Pemberton stated that since the 1982 surgery, he has a constant dull ache in his low back which radiates out to his hips. Although his condition had improved and leveled off by 1985, he characterizes his condition since then as "downhill" with less tolerance for prolonged sitting and standing. He testified to numbness in his legs upon prolonged sitting which is eased by walking. He also complained of sharp jabbing back pains upon sitting or standing too long. On good days he is able to sit for 30 minutes, stand for 15-20 minutes, and lift up to 20 pounds; however, on bad days, he does nothing. He attributed his

---

[4]Osteomyelitis is the inflammation of a bone caused by infection with bacteria or other micro-organisms. Dorland's Medical Dictionary, supra, note 3, 1201. We note that under specified conditions osteomyelitis with persistent or recent acute "activity," established by "laboratory findings," was previously classified as a disabling impairment. 20 C.F.R. pt. 220, app. 1, part A, § 1.08(a). Osteomyelitis has been considered to be a verifier of claims of pain. Moules v. Heckler, 600 F.Supp. 37, 40 (N.D. Cal. 1984). It has not, where there is conduct to the contrary, necessarily assured a finding of disabling pain. E.g., Gendreau v. Finch, 298 F.Supp. 548 (D. Minn. 1969). See also, Odle v. Heckler, 707 F.2d 439, 440 (9th Cir. 1983) (claimant had a "'fair response' with antibiotics to his rib condition").

bad days to either a flare up of the infection or overexertion. He stated he is having more bad days, particularly noting a two-week period of severe pain following a recent back-wrenching fall.

Pemberton takes long showers, hot baths, massages and prescribed medications for pain relief.[5] He also routinely lies on the floor and does stretching exercises each morning, afternoon and evening. He does not use a back brace or cane. In 1984 he began course work for a two-year degree from a community college which he completed in 1987. He occasionally needs help tying his shoes, but otherwise functions independently during the day at home. His daily activities on good days include watching television, taping music and movies, doing the laundry, cutting the grass with a self-propelled mower, doing errands and visiting relatives and friends. He drives to the mall, grocery store, and the homes of his and his fiancee's parents. He reports annual mileage of 7500 to his insurer. Pemberton indicated that Dr. Pazell encouraged him in 1993 to reapply for a disability determination.[6] Pemberton's fiancee testified that his pain had increased during the three and one-half years she has known him. She stated Pemberton used to dance with her slowly when they met, but they no longer dance.

Testimony was solicited from a vocational consultant as to the functional limitations which the hearings officer found credible. In response to one hypothetical assuming Pemberton could stand or walk a total of six hours daily, could lift no more than 20 pounds,

---

[5]Pemberton's prescription medications at the time of the hearing included Darvocet 100 mg., every 4 to 6 hours for pain, although he takes only one tablet per day at bedtime; Flexoril 10 mg. (or its generic counterpart Cyclobenzaprine Hydrochloride), twice daily for muscle spasms; and Xanax .5 mg., once a day for anxiety, which he takes each afternoon.

[6]At the suggestion of Dr. Pazell, Social Security disability benefits have also been claimed, but the record does not show final disposition.

and could not perform work which required bending, climbing or walking on uneven surfaces, the vocational consultant stated Pemberton could perform 50% of the available unskilled light jobs and all of the sedentary jobs. A second hypothetical further restricting Pemberton to jobs permitting alternate sitting and standing every 15 minutes reduced from 50 to 20 the percentage of light jobs he could perform.

The hearings officer affirmed the denial of benefits, finding that although Pemberton suffers from some degree of low back pain radiating into his left hip and leg, he is not disabled for all regular employment and thus not eligible for an annuity. His principal conclusions may be summarized. There was no verification of active or "flaring" disc space infection, which had not been found by the consulting physicians and is only supported by claimant's attribution of "bad days" to such flaring, while his doctor's view is that an infection is "smoldering." The unexplained absence of treatment by antibiotics for "the last dozen or more years," together with the infrequency of medical consultations prior to filing the claim tends to rebut the theory that there are episodes of active disc space infection. There is conflict between claimant's testimony that walking relieves pain and his doctor's note that walking causes pain.[7] The purportedly routine need to lie down for stretching exercise is not tied to the degree of pain claimant feels, because afternoon exercising occurs on both "good" and "bad" days. Claimant's daily activities are "not consistent with what the hearings officer would expect of an individual who is in such pronounced pain that he has to lie down during the day." There was no credible showing that claimant would need work with a stand/sit option, but even if this were true, there are sufficient

_____

[7]It is clear that the hearings officer found this unreliable assertion by Dr. Pazell as an indicator, along with others, that he had become something of an advocate for Pemberton. On the walking point, Dr. Pazell reported a recent decline in walking ability from one hour to "10 minutes or so." R. 414.

jobs that he could perform.  There is no credible showing that lying down for an hour during an eight hour work day is physically required or that claimant's physical condition would cause him to miss work 25% of the time because of the frequency of "bad days."

The Board affirmed and adopted the decision of the hearings officer. This appeal followed.

## II. Discussion

The Railroad Retirement Act provides annuities for  "individuals whose permanent physical or mental condition is such that they are unable to engage in any regular employment."  45 U.S.C. § 231a(a)(1)(v). Disability annuity decisions are evaluated compatibly with social security case law.  See Fountain v. Railroad Retirement Bd., 88 F.3d 528, 530 (8th Cir. 1996) (noting disability provisions of Railroad Retirement Act and Social Security Act are analogous and the pertinent governing regulations are substantively identical).

We must uphold a decision to deny disability annuity payments if the decision is supported by substantial evidence on the record as a whole. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996); see also Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984) (Commissioner has "zone of choice" within which to operate without judicial interference).  Evidence both supporting and detracting from the Board's decision will be considered (Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1994)), but the decision will not be reversed simply because substantial evidence may support the opposite conclusion.  Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995).

The hearings officer made the appropriate sequential determination as required by the railroad retirement guidelines in evaluating whether Pemberton was disabled in 1992.  Fountain v. Railroad Retirement Bd., 88 F.3d 528, 530 (8th Cir. 1996); see also

-7-

20 C.F.R. §§ 218.9, 220.100.  He first determined that Pemberton did not have impairments conclusively establishing qualification for benefits.  See 20 C.F.R. pt. 220, app. 1.  Upon finding Pemberton could not perform his past relevant work with the railroad, the hearings officer focused on whether Pemberton could perform other available work.  While acknowledging that Pemberton has some degree of chronic pain, the hearings officer determined that the central issue was whether the pain was so severe Pemberton could not perform any regular work.  See Soger v. Railroad Retirement Bd., 974 F.2d 90, 93 (8th Cir. 1992).  For the reasons previously stated, he found no disabling pain.  Pemberton argues that the hearings officer improperly discredited his subjective complaints, disregarded the osteomyelitic involvement found by both current doctors, and denied his claim without substantial evidence.

In addition to considering objective medical evidence, it is of course true that subjective descriptions of disabling pain must also be considered in light of such things as testimony about functional restrictions, observations of third parties regarding the claimant's daily activities, levels of pain, the dosage and effects of medication, and precipitating and aggravating factors.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (per curiam).

In the present case, the hearings officer reviewed Pemberton's activities and concluded they were not consistent with complaints of constant pronounced pain.  The hearings officer noted that Pemberton takes care of his personal needs without assistance, does the laundry, cuts the grass, drives a car to run errands and to visit his fiancee's parents 20 minutes away, and socializes with relatives and friends.

Credibility determinations of a claimant's subjective testimony lie within the responsibility particularly given to the hearings officer and the Board.  See Benski v. Bowen, 830 F.2d 878,

-8-

882 (8th Cir. 1987); see also Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990) ("If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment.").

The major issue on appeal is whether Pemberton's testimony attributing his inability to hold steady employment to frequent, incapacitating "bad days" can reasonably be considered incredible or at least exaggerated. A second issue relates to a claimed need to lie down and exercise for an extended period in the afternoon.

Neither his fiancee nor any other third party familiar with Pemberton's conduct testified to periodic days of such distress that he was forced to cancel his usual routine or a scheduled activity. The "bad days" apparently did not cause him to lose days in school in 1987, at a time when his condition had purportedly stabilized. Pemberton asserts that his condition has deteriorated since 1987.[8] His testimony is not verified by increased visits to a doctor, any increase or material usage of antibiotics, or taking the prescribed dosage of pain medication, see supra note 5. Pemberton's fiancee claimed that his condition has worsened during the three and one-half years of her experience, which began when he was able to dance. There is, however, no showing of a sudden worsening in Pemberton's condition in the period 1992-3, when the claim was filed.

---

[8]There is, however, some conflict between his claim of a "downhill slide," supported by Ms. Buerge, and other testimony that his condition has not changed a great deal for over ten years. His opening brief on appeal asserts, surprisingly, that "Pemberton never alleged that his condition has become worse in the last few years." Pet. Br. 34. If his acknowledgment of a stable condition since the mid-1980s is accurate, additional credibility issues are raised concerning the Pemberton and Buerge testimony, and adverse evidence like the successful educational experience and the Overesch evaluation becomes more significant.

A causation defect also exists with respect to evaluating the "bad days" testimony.  Pemberton acknowledges that his bad days are sometimes traceable to overexertion rather than a strictly medical condition.[9]  His theory that some of his "bad days" are caused by a flaring infection is a layman's concept unsupported by acceptable proof such as test results,[10] and is weakened by the absence of any material evidence of treatment or even consultation with doctors about treatment short of surgery.

Pemberton also challenges the hearings officer's rejection of Dr. Pazell's opinion that he is totally disabled from any employment.  A treating physician's opinion is generally accorded great weight, but an opinion as to whether a patient is able to perform gainful employment is not a medical determination within the competence of a physician, but a legal determination which must be made by the Board.  See Nelson v. Sullivan, 946 F.2d 1314, 1316-17 (8th Cir. 1991) (per curiam).  As we have observed, moreover, there are signs of advocacy in Dr. Pazell's approach to this controversy,

_____

[9]Dr. Pazell records a statement that when Pemberton does not exceed his physical limits "he can live a reasonably normal life." R. 422.

[10]In a December 1994 report, Dr. Pazell refers to "laboratory findings" that have "documented the presence of infection." Petitioner acknowledges that x-rays in April 1993 were evaluated as showing "evidence of previous infection." R. 393 (emphasis added).  While it is undisputed that there was an active staph infection some 15 years ago, and x-rays, laboratory studies or bone scans can apparently identify active or acute infection of this nature, the record does not reflect confirmation of such a condition in recent years.  On the contrary, Pemberton has declined to have testing done, stating that he is uninsured and does not have the money to spare for such testing.
He did receive a substantial sum from the settlement of his claim against the railroad and bought a $200,000 house, but the record reflects that when his income from investments is pooled with the income of Ms. Buerge, the couple is in rather modest circumstances.  Nevertheless, the failure to seek confirmation of a "flaring" or otherwise active infectious condition does reduce the credibility of the claim.

-10-

and the hearings officer noted several concerns about the reliability of certain findings and comments.

In evaluating the objective evidence available, the hearings officer reviewed the 1985 and 1988 reports of consulting examinations by Dr. Overesch. Although Dr. Overesch restricted Pemberton from heavy work, his clinical findings do not support a total disability ruling. The more recent 1993 consultative report by Dr. Thomas-Richards also imposed certain work restrictions on Pemberton based on the chronic low back pain aggravated by exertional activity.

The contention that Dr. Thomas-Richards is supportive of Dr. Pazell because he found osteomyelitic "affectation" and "involvement" does not deal with the pertinent question, whether there has been recent <u>active</u> disc space infection. Even Dr. Pazell's reference to a "smoldering" condition does not go so far as claimant's theory of "flaring."[11]

Pemberton's contention that "flaring" spinal disc infection causes such frequent "bad days" that he could not work at a regular job could properly be ruled insufficient. There is no adequate showing of an active infection; any special periods of suffering could be explained by his having exceeded his limits through unusual straining and overexertion; and there is no third-party support for claimant's contention that he frequently is forced to limit his activities for days at a time.

---

[11]The terminology of Dr. Pazell seems to be rarely used, but does not in itself connote an active or flaring infection. <u>See e.g.</u>, <u>Sprague v. Director, Office of Worker's Compensation Programs</u>, 688 F.2d 862, 866 n. 9 (1st Cir. 1982). From the context, it appears to be Dr. Pazell's hypothesis that there is a mildly active infection periodically creating great pain (rather than an existing condition in remission), but the record does not contain proof of an active infection.

As to the need to exercise and stretch for as much as an hour in the afternoon, the conduct is quite consistent with a routine of resting or exercising that an unemployed person might adopt voluntarily, particularly when, as here, he suffers from some degree of pain. Claims of fatigue and pain requiring periods of napping and lying down during usual working hours are familiar in disability cases. See e.g., Aborn v. Sullivan, 959 F.2d 111, 112 (8th Cir. 1992). Aborn holds they are subject to Polaski analysis, and can be rejected in a case, like the present one, where there are credibility issues resolved against a claimant. In this case, as the hearings officer pointed out, the asserted need to lie on the floor for an extended period in the afternoon is not correlated with severe pain. The claim of overpowering necessity for exercising at a particular time each day was reasonably rejected, considering the record as a whole.

For the reasons stated, and for the reasons advanced by the hearings officer, we conclude that the decision of the Railroad Retirement Board is within the "zone of choice" available to the trier of fact, and it is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT

-12-